1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRANT DALE HURLBERT, | Case No.: 15cv0752 AJB (PCL) |
| Petitioner, | **REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| WILLIAM L. MUNIZ, | |
| Respondent. | |

## I.    INTRODUCTION

Petitioner Grant Dale Hurlbert[1] ("Petitioner" or "Hurlbert"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCE312391 for burglary, evading an officer with reckless driving, taking a vehicle

---

[1] In the state court transcripts, Petitioner's name is spelled as both "Hurlburt" and "Hurlbert." (*See e.g.*, Lodgment No. 1, vol. 2 at 210; vol. 6 at 1322.)

1  without permission and resisting arrest.  (Pet. at 1, ECF No. 1 "Pet.")[2]  The Court has

2  reviewed the Amended Petition, the Answer and Memorandum of Points and Authorities

3  in Support of the Answer, the Traverse, the lodgments, and all the supporting documents

4  submitted by both parties.  For the reasons discussed below, the Court **RECOMMENDS**

5  the Petition be **DENIED**.

6  **II.    FACTUAL BACKGROUND**

7            This Court gives deference to state court findings of fact and presumes them to be

8  correct; Petitioner may rebut the presumption of correctness, but only by clear and

9  convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*,

10  506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences

11  properly drawn from these facts, are entitled to statutory presumption of correctness).

12  The following facts are taken from the California Court of Appeal opinion:

13              In May 2011, officers responded to a call reporting a stolen white
    Mercury Sable.  Items left where the car was taken contained
14              fingerprints matching those belonging to Hurlbert.

15
              About a month later, officers responded to a call from a store
16              about a suspicious person in the store who drove away in a white
              Mercury Sable.  The license plate number of the Mercury matched that
17              of the stolen vehicle.
18

19              As officers approached the store, they saw a white Mercury exit
              the parking lot of the store.  As the Mercury approached, one of the
20              officers turned his police vehicle into oncoming traffic in an attempt to
              the stop the car.  However, the Mercury drove around the officer's
21              vehicle, veered into the construction area and sped away.  At that point,
22              one of the officers saw the driver of the Mercury and identified him as
              Hurlbert.
23

24              Officer's engaged their lights and sirens and chased Hurlbert for
25              approximately one to two minutes until he stopped at a dead end.
              Hurlbert jumped out of the Mercury and hit the hood of one of the
26

27  _____

28  [2]  Page numbers for docketed materials cited in this Report and Recommendation refer to those
    imprinted by the court's electronic case filing system.

officer's vehicles.  One of the officers pulled out his gun, pointed it at Hurlbert and shouted, "Stop or I'll shoot."  Hurlbert immediately took off running and hopped a nearby fence.  After Hurlbert hopped the fence, one of the officers -- before losing sight of him -- saw Hurlbert empty his pockets and take off his black shirt and throw it on the ground.  Hurlbert encountered and ran from at least two other officers.  Officers lost sight of Hurlbert after he ran up the driveway of a nearby residence.

Hurlbert walked onto the back deck of Wayne Tibbetts's residence and attempted to speak with Tibbetts's mother-in-law.  However, she did not speak English and motioned for Hurlbert to go inside the house and speak to her daughter.  Once inside the residence, Hurlbert spoke to Tibbetts's wife.  However, she also did not speak much English and, thus, called for her husband.

When Tibbetts came downstairs, Hurlbert told him, "There's some people outside trying to hurt me."  Tibbetts responded, "Who, the police?"  Hurlbert did not respond and continued calmly walking through the house.  As Hurlbert approached the kitchen door, he turned back and looked over his shoulder at Tibbetts, paused for a few seconds and then exited the house.

Police found Hurlbert a short time later in Tibbetts's yard under a tree and, although he was not wearing a shirt, a blue shirt was lying next to him on the ground.  When officers contacted Hurlbert, he said, "Why are you doing this, I'm just . . . laying under a tree in my yard?" and "Why are you messing with me, this is my house . . . check my I.D."  Hurlbert also asked the officers, "[W]hat color shirt was the guy wearing that you are looking for, because I have a blue shirt."  When officers checked Hurlbert's pockets, they found a wallet with an I.D. that belonged to Tibbetts and a set of car keys.

Approximately 45 minutes after the incident, Tibbetts noticed his wallet and keys that he had left in a basket on the counter by the kitchen door were missing.  Tibbetts called the police.  The officers responded and showed Tibbetts the T-shirt, wallet and keys found on or near Hurlbert.  Tibbetts identified the items as belonging to him.

(Lodgment No. 6 at 3-4.)

/ / /

3

15cv0752 AJB (PCL)

## III.   PROCEDURAL BACKGROUND

On March 15, 2012, the District Attorney filed a second amended information, charging Hurlbert with first degree burglary (count one) (Cal. Penal Code §§ 459 & 460), evading an officer with reckless driving (count two) (Cal. Vehicle Code § 2800.2(a)), unlawful taking and driving a vehicle (count three) (Cal. Vehicle Code § 10851(a)), and resisting an officer (count four) (Cal. Penal Code § 148(a)(1)). (Lodgment No. 2, vol. 1 at 25.)   It was further alleged that the burglary was a "violent felony" (Cal. Penal Code § 667.5(c)(21)) because another person other than an accomplice was present in the house during the burglary. (Lodgment No. 2, vol. 1 at 25-26.)   In addition, it was alleged that Hurlbert had previously been convicted of receiving a stolen vehicle (Cal. Penal Code § 469d).   Finally, it was alleged that Petitioner suffered one prison prior as well as one prior serious or violent felony conviction. (Cal. Penal Code §§ 664(1)(1), (b)-(i), 668, 1170.12, and 1192.7) (Lodgment No. 2, vol. 1 at 26-27.)

On April 27, 2012, a jury found Hurlbert guilty of resisting an officer (count four). (Lodgment No. 2, vol. 1 at 151.)   The jury was unable to ready a verdict on the remaining three counts and the trial court declared a mistrial as to those counts. (Lodgment No. 2, vol. 2 at 362-63; *see also* Lodgment No. 1, vol. 2 at 311.)

Petitioner, now representing himself (*see* Lodgment No. 1, vol. 3 at 1008), was retried on counts one through three and on June 22, 2012, a jury found Hurlbert guilty on all three remaining counts. (Lodgment No. 2, vol. 2 at 225-28; Lodgment No. 1, vol. 7 at 1504-05.)   The jury also found Hurlbert had suffered one prior strike conviction, a prior serious or felony conviction and had served two prison sentences. (Lodgment No. 2, vol. 2 at 349-50; Lodgment No. 1, vol. 7 at 1520-21.)   The trial court sentenced Petitioner to 17 years, four months in prison. (Lodgment No. 2, vol. 2 at 262; Lodgment No. 1, vol. 8 at 1553-54.)

Hurlbert appealed his conviction to the California Court of Appeal, raising two claims: (1) there was insufficient evidence to support the burglary conviction and (2) his sentence was improper because it imposed two enhancements for the same prior

4

conviction. (*See* Lodgment No. 3.)   On January 24, 2014, the appellate court modified Petitioner's sentence to strike the one-year prior prison term enhancement.   The court otherwise affirmed the conviction. (*See* Lodgment No. 6.)   Petitioner then filed a petition for review in the California Supreme Court, again arguing there was insufficient evidence to support his burglary conviction. (*See* Lodgment No. 7.)   The court denied the petition without comment or citation on April 9, 2014. (Lodgment No. 9.)

On April 6, 2015, Hurlbert filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court, raising three grounds for relief. (ECF No. 1.)   Because it appeared from the face of the Petition that Hurlbert had failed to raise two of the claims in the state supreme court, this Court issued an Order notifying Petitioner of his possible failure to exhaust those claims. (ECF No. 7.)   Petitioner responded by filing a motion for stay and abeyance. (ECF No. 9.)   On October 8, 2015, this Court denied Petitioner's motion for stay. (ECF No. 15.)   The Court ordered Respondent to answer the petition on the merits as to all claims, including grounds two and three, which appeared to be unexhausted. *Id.* (citing *Cassett v. Stewart*, 406 F.3d 614 623-24 (9th Cir. 2005) (permitting district courts to deny an unexhausted petition on the merits where "it is perfectly clear that the applicant does not raise even a colorable claim")).   Respondent filed an Answer on November 5, 2015. (ECF No. 19.)   Hurlbert filed a Traverse on December 9, 2015 (ECF No. 24.)

## IV.   SCOPE OF REVIEW

Hurlbert's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's

1   determination; rather, the court applies an extraordinarily deferential review, inquiring
2   only whether the state court's decision was objectively unreasonable. *See Yarborough v.*
3   *Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  In
4   order to grant relief under § 2254(d)(2), a federal court "must be convinced that an
5   appellate panel, applying the normal standards of appellate review, could not reasonably
6   conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d
7   992, 1001 (9th Cir. 2004).

8           A federal habeas court may grant relief under the "contrary to" clause if the state
9   court applied a rule different from the governing law set forth in Supreme Court cases, or
10  if it decided a case differently than the Supreme Court on a set of materially
11  indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant
12  relief under the "unreasonable application" clause if the state court correctly identified
13  the governing legal principle from Supreme Court decisions but unreasonably applied
14  those decisions to the facts of a particular case. *Id*.  Additionally, the "unreasonable
15  application" clause requires that the state court decision be more than incorrect or
16  erroneous; to warrant habeas relief, the state court's application of clearly established
17  federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75
18  (2003).  "[A] federal habeas court may not issue the writ simply because that court
19  concludes in its independent judgment that the relevant state-court decision applied
20  clearly established federal law erroneously or incorrectly.  Rather, that application must
21  also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).  "A state court's
22  determination that a claim lacks merit precludes federal habeas relief so long as
23  'fairminded jurists could disagree' on the correctness of the state court's decision."
24  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541
25  U.S. 652, 664 (2004)).

26          Where there is no reasoned decision from the state's highest court, the Court
27  "looks through" to the underlying appellate court decision and presumes it provides the
28  basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S.

1   797, 805-06 (1991).  If the dispositive state court order does not "furnish a basis for its

2   reasoning," federal habeas courts must conduct an independent review of the record to

3   determine whether the state court's decision is contrary to, or an unreasonable application

4   of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th

5   Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v.*

6   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite

7   Supreme Court precedent when resolving a habeas corpus claim.  *See Early*, 537 U.S. at

8   8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts

9   [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly

10  established federal law.  *Id.*  Clearly established federal law, for purposes of § 2254(d),

11  means "the governing principle or principles set forth by the Supreme Court at the time

12  the state court renders its decision." *Andrade*, 538 U.S. at 72.

13  **V.   DISCUSSION**

14       Hurlbert raises three claims in his Petition.  First, he argues his federal due process

15  rights were violated because there was insufficient evidence to sustain his first degree

16  burglary conviction. (Pet. at 9-19.)  In ground two, he asserts his due process rights were

17  violated when the prosecutor presented false evidence and withheld exculpatory

18  evidence.  (*Id.* at 38, 42-46.)  Finally, in his third claim, he contents appellate counsel was

19  ineffective in violation of his Sixth Amendment rights, for failing to raise the false

20  evidence claim presented in ground two, on direct appeal.  (*Id.* at 47.)

21       **A.   <u>Ground One:  Insufficient Evidence</u>**

22       Hurlbert argues there was insufficient evidence to support a conviction for first

23  degree burglary.  Specifically, he contends there was not sufficient evidence to support

24  the inference that he had specific intent to commit theft at the time he entered the

25  Tibbetts' residence. (*See* Pet. at 9-20.)

26       **1.   *State Court Decision***

27       Petitioner raised this claim in a petition for review to the California Supreme Court

28  and it was denied without comment. (*See* Lodgment Nos. 7 & 8.)  This Court therefore

7

1    "looks through" to the last reasoned state court decision to address Hurlbert's claim. *See*

2    *Ylst*, 501 U.S. at 805-06. The California Court of Appeal denied the claim, stating:

3       *Guiding Principles*

4            Hurlbert contends there is insufficient evidence in the record to
5       show he was guilty of first degree burglary because he allegedly did not
        harbor the requisite intent to commit theft when he entered the
6       Tibbetts' residence.

7            A defendant commits a burglary "if the defendant enters a
8       residence or other enumerated structure 'with intent to commit grand or
        petit larceny or any felony.' (§ 459.)" (*People v. Ramirez* (2006) 39
9       Cal.4th 398, 463.) A defendant commits first degree burglary if the
10      dwelling is inhabited. (§ 460.) The intent required to commit a
        burglary must be present at the time of entry. (*People v. Sparks* (2002)
11      28 Cal.4th 71, 85, fn. 17.) However, intent is rarely demonstrated by
12      direct proof and, as a result, may be inferred from facts and
        circumstances shown through evidence. (*People v. Holt* (1997) 15
13      Cal.4th 619, 669.) Whether the entry was accompanied by the requisite
14      intent is a question of fact for the jury. (*People v. Hopkins* (1983) 149
        Cal.App.3d 36, 44.)
15

16           On appeal, we must review the whole record rather than isolated
17      bits of evidence to determine if there is substantial evidence to support
        the verdict. (*People v. Johnson* (1980) 26 Cal.3d 557, 577.)
18      Substantial evidence is evidence that is reasonable, credible and of
19      solid value. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) We "neither
        reweigh the evidence nor reevaluate the credibility of witnesses" in
20      making this determination. (*People v. Jennings* (2010) 50 Cal.4th 616,
21      638.) Instead, we must ask "'whether, after viewing the evidence in the
        light most favorable to the prosecution, any rational trier of fact could
22      have found the essential elements of [burglary] beyond a reasonable
23      doubt.'" (*People v. Marshall* (1997) 15 Cal.4th 1, 34, quoting *Jackson
        v. Virginia* (1979) 443 U.S. 307, 319.) When the facts and
24      circumstances of a particular case and the conduct of the defendant
25      justify a reasonable inference of intent to commit grand or petit theft
        upon entering the residence, the conviction may not be disturbed on
26      appeal. (*People v. Cain* (1995) 10 Cal.4th 1, 47.)

27

28

                                            8

*Analysis*

We conclude the jury's finding that Hurlbert intended to commit a theft when he entered the Tibbetts' residence is amply supported by the evidence in the record. The record shows Hurlbert fled from officers in a stolen vehicle, got out of the vehicle, disobeyed the officer's many requests to stop and continued to flee by jumping a fence. After he jumped the fence, he took his shirt off, emptied his pockets and continued running from officers. This circumstantial evidence supports the inference that Hurlbert was fleeing from police to avoid capture. In an effort to avoid capture, Hurlbert rid himself of many identifying items on his person, including his T-shirt and any items in his pocket, in an attempt to conceal his identity from police.

When police apprehended him, Hurlbert spontaneously shouted, "[W]hat color shirt was the guy wearing that you are looking for, because I have a blue shirt." Hurlbert told police that he was in his own yard and they should check his I.D. because that would prove he lived at the residence. Hurlbert tried to convince police he was Tibbetts and not the suspect they were looking for. This evidence strongly supports the finding that Hurlbert was attempting to change his identity in order to avoid capture and, as relevant to count 1, that he entered the home of Tibbetts with the intent to steal items to conceal his identity and in order to continue to evade capture from the police.

The record reflects that the jury heard this evidence as well as Hurlbert's own testimony that he went to the Tibbetts' residence because he needed water, that Wayne Tibbetts allegedly offered Hurlbert his own shirt and that he did not take or intend to take any items from the residence. The jury also heard Wayne Tibbetts's testimony in rebuttal that he neither gave Hurlbert his shirt nor permission to take any items -- including his keys and wallet -- from his residence.

The record shows that the defense presented the jury with its version of events and aggressively argued during closing that Hurlbert lacked the intent to commit burglary when he entered the Tibbetts' residence. As the fact finder, the jury was entitled to accept Hurlbert's testimony; by the same logic, the jury also was entitled to reject that testimony, as turned out to be the case here. (See *People v. Smith*

(2005) 37 Cal.4th 733, 739 [a court of review is bound to accept the factual and credibility determinations of the trier of fact].)  We thus conclude substantial evidence in the record supports the finding of the jury that Hurlbert intended to commit burglary when he entered the Tibbetts' residence.

Furthermore, that Wayne Tibbetts's mother-in-law motioned for Hurlbert to enter the residence does not change our conclusion.  The entry required to support a burglary conviction need not constitute a trespass. (*People v. Pendleton* (1979) 25 Cal.3d 371, 382; *People v. Talbot* (1966) 64 Cal.2d 691, 700, overruled on other grounds as stated in *People v. Ireland* (1969) 70 Cal.2d 522, 540.)  A person who "enters a room or building with intent to commit larceny is guilty of burglary even though express or implied permission to enter has been given to him [or her] personally or as a member of the public" so long as he or she does not have an unconditional possessory right to enter. (*People v. Deptula* (1962) 58 Cal.2d 225, 228; see also *People v. Barry* (1892) 94 Cal. 481, 483 [defendant was guilty of burglary even though he entered a store through a public entrance during business hours]; *People v. Gauze* (1975) 15 Cal.3d 709, 714 [defendant not guilty of burglarizing his own apartment because defendant had an absolute right to enter even for a felonious purpose].)

Here, the Tibbetts' residence did not belong to Hurlbert and he had no possessory right to enter it.  Although Hurlbert claims Wayne Tibbetts's mother-in-law consented to him entering the residence, the record shows she could not speak English and, in any event, Hurlbert entered with the intent to commit larceny and, therefore, he entered without invitation. (*People v. Gauze, supra,* 15 Cal.3d at p. 713 ["'a party who enters with the intention to commit a felony enters without an invitation'"].)

[Footnote 2:  Although there is substantial evidence in the record to support the finding that Hurlbert intended to take something at the time and/or before he entered the house, assuming arguendo he formed the intent after he entered the house, the California Supreme Court has held intent acquired after entering a residence is sufficient to uphold a burglary conviction. (See *People v. Sparks, supra,* 28 Cal.4th at p. 73 [entry into a bedroom within a single-family house with the requisite intent can support a burglary conviction even if that intent was formed only after the entry into the house].)]

(Lodgment No. 6 at 5-9.)

### 2.    *Clearly Established Law*

The Supreme Court has held that the due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005); *see also Cavazos v. Smith*, – U.S. – , 132 S.Ct. 2, 6 (2011) (per curiam ).  The Court must engage in a thorough review of the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1275 (citing *Jackson*, 443 U.S. at 319).

Furthermore, "[c]ircumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.) amended on denial of reh'g, 798 F.2d 1250 (9th Cir. 1986)).  A petitioner faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds. *Juan H.*, 408 F.3d at 1275.  A petitioner's insufficient evidence claim must be examined "with reference to the elements of the criminal offense as set forth by state law."    *Id.*

### 3.    *Discussion*

Under California law, a person who enters a residence or commercial building with the intent to commit a felony or theft is guilty of burglary. *See* Cal. Penal Code § 459.  "Every burglary of an inhabited dwelling house . . . is burglary of the first degree." Cal. Penal Code § 460(a); *see also People v. Rodriguez*, 18 Cal. Rptr. 3d 550, 557 (Cal. Ct. App. 2004).   "The entry need not be a trespass to support a burglary conviction. [Citations.]  Thus, a person who enters for a felonious purpose may be found guilty of burglary even if he enters with the owner's or occupant's consent." *People v. Frye*, 18 Cal. 4th 894, 954 (Cal. 1998) (disapproved on another ground in *People v. Doolin*, 45

1   Cal. 4th 390, 421 fn. 22 (Cal. 2009)).

2         Furthermore, while the existence of the specific intent is a necessary element of

3   burglary, "intent is rarely demonstrated by direct proof, and as a result, may be inferred

4   from all of the facts and circumstances" disclosed by the evidence. *In re Leanna W.*, 15

5   Cal. Rptr. 3d 616, 621 (Cal. Ct. App. 2004) (citing *People v. Holt*, 15 Cal. 4th 619, 669-

6   70 (Cal. 1997)); *see also People v. Terry*, 202 Cal. App. 2d 604, 608 (Cal. Ct. App.

7   1962). "Evidence such as theft of property from a dwelling may create a reasonable

8   inference that there was intent to commit theft at the time of entry." *Leanna W.*, 15 Cal.

9   Rptr. 3d at 621.

10        The question here is whether the evidence, including that of Hurlbert's conduct

11  before, during and after his entry into the Tibbetts' home, supports a reasonable inference

12  that he intended to commit theft at the time he entered the residence.  Evidence presented

13  at trial showed that Hurlbert was driving a stolen car and being pursued by several law

14  enforcement officers. (*See* Lodgment No. 1, vol. 4 at 1080-86, vol. 5 at 1235-36.)

15  Deputy Laplant was not far behind Hurlbert in his patrol car when they reached a dead

16  end.  Hurlbert stopped his car abruptly, jumped out and collided with Deputy Laplant's

17  patrol vehicle. (*Id.*, vol. 5 at 1240-41.)  Deputy Laplant got out of his vehicle, drew his

18  gun and ordered Petitioner to stop.  Hurlbert turned and took off on foot.  (*Id.* at 1243.)

19  Petitioner was wearing black pants and a black shirt.  (*Id.*)  As he was running, he began

20  emptying his pockets.  (*Id.* at 1245, 2147-48.)  Eventually, Hurlbert came to an iron fence

21  and jumped over it.  He then took off his black shirt and discarded it.  (*Id.* at 1244-45.)

22        After evading several deputies, Hurlbert temporarily lost police when he arrived at

23  the Tibbetts' residence.  (*See id.*, vol. 4 at 1090-91, vol. 5 at 1215-16, 1248.)   Petitioner

24  approached Tibbetts' mother-in-law, Chen Gui Wang, who was on the deck.  (*Id.* vol. 1 at

25  187.)[3]  Chen Gui did not speak or understand English and motioned for Hurlbert talk to her

26

27

28  [3]  Chen Gui Wang testified at Hurlbert's first trial, which ended in a mistrial for counts one, two and
    three. (*See* Lodgment No. 1, vol. 1 at 187-193.)  At the time of Petitioner's second trial, Ms. Wang was

1  daughter, who was just inside. (*Id.* at 190.) Once inside, Hurlbert encountered Tibbetts'
2  wife, Bing Tao Wang, who saw him from across the room. (*Id.* vol. 5 at 1196-97.) Bing
3  Tao, who spoke very little English, was confused and could not understand what Hurlbert
4  was saying. She immediately called for Tibbetts, her husband. (*Id.* at 1197-98.) Once
5  Tibbetts came downstairs, Bing Tao left to check on her mother. (*Id.* at 1200.) Tibbetts
6  asked Hurlbert what he was doing there and Hurlbert replied that there were people outside
7  who wanted to hurt him. Tibbetts responded, "Who, the police?" (*Id.* at 1158.)

8      At that point, Hurlbert was standing near where Tibbetts had previously tossed his
9  blue T-shirt. (*Id.* at 1156.) Hurlbert continued through the house to the kitchen exit door.
10  He paused at the door near a basket that contained Tibbetts' wallet and keys. (*Id.* at 1158-
11  60.) Tibbetts could not see if Petitioner had anything in his hands when he left the house.
12  (*Id.* at 1161-62.) As soon as Hulbert left, Tibbetts locked the door. (*Id.* at 1164.)
13  Approximately 45 minutes later, Tibbetts noticed his wallet and car key missing from the
14  basket and he reported it to the Sheriff's Department. (*Id.* at 1166.)

15      Meanwhile, officers apprehended Hurlbert shortly after exited the Tibbetts' home.
16  He was found hiding under a tree in the Tibbetts' yard. (*Id.* vol. 4 at 1092-93, vol. 5 at
17  1220.) As he was being handcuffed, Hurlbert told deputies that he was in his own yard.
18  (*Id.* vol. 4 at 1092.) He asked them to check the identification in his wallet to show that
19  he lived at the Tibbetts' residence, and was not the person they were looking for. (*Id.*
20  vol. 4 at 1092-94, vol. 5 at 1218.) Hurlbert also asked the deputies "what color shirt was
21  the guy wearing that you are looking for, because I have a blue shirt." (*Id.* at 1093.)
22  Tibbetts' blue T-shirt was on the ground next to Petitioner. (*Id.* vol. 4 at 1092-93, vol. 5
23  at 1220.) The deputies recovered Tibbetts' wallet, containing his identification, in
24  Hurlbert's back pocket, and Tibbetts' car key in Hurlbert's front pocket. (*Id.* vol. 4 at
25  193-95)

26

27

28  in China and unavailable to testify. Her testimony from the first trial was read to the jury at Hurlbert's
    second trial. (*See* Lodgment No. 1, vol. 6 at 1321-22.)

1    Based on the foregoing and viewing all the evidence and all reasonable inferences

2  in the light most favorable to the verdict there is sufficient evidence to support Hurlbert's

3  burglary conviction.  A reasonable juror could have concluded that Hurlbert, who was

4  fleeing from police, entered the Tibbetts' home with intent to steal personal items or

5  clothing to help conceal his identity from police. *See Jackson*, 443 U.S. at 319.  Hurlbert

6  specifically mentioned the items after his apprehension, which could be construed as an

7  attempt to convince officers that he was *not* the suspect the officers had been pursuing.

8  This reasonably supports an inference that Hurlbert entered the Tibbetts' house with

9  intent to commit theft.  Further, the mere fact that evidence showed Hurlbert stole the

10  items from the Tibbets' home can support an inference that he had intent to steal when he

11  entered the residence. *See Leanna W.*, 15 Cal. Rptr. 3d at 621. ("Evidence such as theft

12  of property from a dwelling may create a reasonable inference that there was intent to

13  commit theft at the time of entry.")   That Hurlbert had tacit permission from Chen Gui

14  Wang to enter the house is irrelevant since there is sufficient evidence of Petitioner's

15  intent to steal before entering the house. *See Frye*, 18 Cal. 4th at 954 (stating "entry need

16  not be a trespass to support a burglary conviction").

17    In his Petition, Hurlbert argues that his trial testimony at trial -- that he was only at

18  the Tibbetts' house to obtain water and assistance -- sufficiently undermined any

19  inference that he had the intent to steal upon entering the home.  Yet, viewing the

20  evidence in the light most favorable to the prosecution, a reasonable juror could have

21  reasonably rejected Hurlbert's version of events.  During his testimony, Hurlbert flatly

22  denied taking anything from the house. (Lodgment No. 1, vol. 6 at 1348-49.) He

23  claimed Tibbetts had offered him his blue T-shirt, unsolicited, and that he had declined to

24  take it. (*Id.* at 1348.) He further testified that Deputy Fuhr must have planted the

25  evidence by going to the Tibbetts' house shortly after Hurlbert was apprehended, taking

26  the wallet, car key and blue shirt and returning to plant the shirt near where Hurlbert was

27  handcuffed. (*Id.* at 1352.)

28    Hurlbert's testimony was contradicted by almost every other witness.  Tibbetts

1   denied giving Hurlbert his T-shirt. (*Id.* vol. 5 at 1175, 1190-91.)   Deputy Robbins

2   testified that the blue shirt was on the ground near Hurlbert when she apprehended him.

3   (*Id.* at 1220.)   Deputy Fuhr likewise testified that the blue shirt was next to Hurlbert

4   when he was found. (*Id.* vol. 5 at 1134-35, 1220.)   Fuhr and Robbins also testified that

5   Tibbetts' wallet and car key were found in Hurlbert's pocket. (*Id.* vol. 4 at 1093-94, vol.

6   5 at 1218, 1224.)   Their testimony was corroborated by Deputy Laplant. (*Id.* vol. 5 at

7   1250.)

8          Petitioner's arguments are premised on his version of the incident and

9   interpretation of the evidence.   "The relevant inquiry is not whether the evidence

10   excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its

11   verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991); *see also Wright v.*

12   *West*, 505 U.S. 277, 296 (1992) (stating that the prosecutor need not affirmatively "rule

13   out every hypothesis except that of guilt").   A federal habeas court faced with a factual

14   record "that supports conflicting inferences must presume . . . that the trier of fact

15   resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

16   *Jackson*, 443 U.S. at 326; *see Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007) (A

17   federal habeas court "makes no determination of the facts in the ordinary sense of

18   resolving factual disputes.") (internal quotation marks omitted).   Thus, this Court must

19   presume that the jury rejected petitioner's version of the incident as well as his

20   interpretation of the evidence.

21          In sum, viewing the evidence at trial in the light most favorable to the prosecution,

22   the evidence was sufficient to enable a rational jury to find that Petitioner entered the

23   Tibbetts residence with the intent to commit theft, and was thus guilty of first degree

24   burglary.   Accordingly, the state court's denial of Hurlbert's claim was neither contrary

25   to, nor an unreasonable application of, clearly established law. 28 U.S.C. § 2254 (d)(1);

26   *Williams*, 423 U.S. at 412-13.   Furthermore, the state court's factual findings are

27   reasonably supported by the evidence presented at the state court proceedings. 28 U.S.C.

28   § 2254(d)(2); *Taylor*, 366 F.3d at 1001.   The Court **RECOMMENDS** the claim be

15

1    DENIED.

2    **B.    Ground Two: False Testimony, Withholding Evidence and *Miranda***

3        In his second ground for relief, Hurlbert claims that his conviction was based on

4    "false testimony/evidence." (*See* Pet. at 42.) He further contends the prosecutor withheld

5    exculpatory evidence, in violation of due process and the Supreme Court's decision in

6    *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.* at 38, 44.) Finally, Petitioner also appears

7    to claim that his *Miranda* rights were violated. (*Id.* at 42-43.)

8        As discussed in this Court's October 8, 2015 Order (ECF No. 15), this claim has

9    not been presented to the California Supreme Court. Typically, the exhaustion of

10   available state judicial remedies is a prerequisite to a federal court's consideration of

11   claims presented in habeas corpus proceedings. 28 U.S.C. § 2254(b); *see Rose v. Lundy*,

12   455 U.S. 509, 522 (1982). Federal district courts, however, have the discretion to deny a

13   habeas "application" on the merits despite a petitioner's failure to fully exhaust state

14   judicial remedies. *See* 28 U.S.C. § 2254(b)(2) (West 2006). A court may deny an

15   unexhausted claim on the merits when "it is perfectly clear that the applicant does not

16   raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir.

17   2005); *see also Lambrix v. Singletary*, 520 U.S. 518, 524 (1997) (where it is easier to

18   resolve a petitioner's claims on the merits, the interests of judicial economy counsel

19   against deciding the often more complicated issue of procedural default); *Smith v.*

20   *Stewart*, 407 F. App'x 237, 237-38 (9th Cir. 2011) (stating that the court need not address

21   procedural default and exhaustion arguments because the claims were clearly without

22   merit).

23       Here, it is clear Hurlbert has failed to present a colorable claim. First, he contends

24   that his conviction was based on "false evidence." "The knowing use of perjured

25   testimony by a prosecutor generally requires that the conviction be set aside." *Killian v.*

26   *Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97,

27   103 (1976)). "The same result obtains when the State, although not soliciting false

28   evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of*

1   *Illinois*, 360 U.S. 264, 269 (1959).  However, the presentation of conflicting versions of

2   events, without more, does not constitute knowing presentation of false evidence.  *United*

3   *States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).  To prevail on such claims, three

4   things are required: (1) the testimony or evidence must be false, (2) the prosecution must

5   have known or should have known it was false, and (3) the false testimony must be

6   material.  *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing *United*

7   *States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).

8         Petitioner argues Deputy Fuhr planted Tibbetts' blue T-shirt, wallet and car key, in

9   an attempt to frame him for burglary.  Hurlbert claims Deputy Fuhr and Deputy Robbins

10  then testified falsely that the items from the Tibbets' residence were found with Hurlbert

11  when he was apprehended.  Other than his own self-serving statements, Petitioner has

12  presented no evidence that Deputy Fuhr, or any other witness, testified falsely.  He

13  simply reasserts claims he made during his trial, specifically that he did not take the items

14  from the Tibbetts' residence and instead, after he was apprehended, Deputy Fuhr

15  obtained the T-shirt, wallet and car key from the Tibbetts' home and planted them in the

16  area where Hurlbert was handcuffed.  He claims that Fuhr's testimony that he found the

17  shirt on the ground near him and the wallet in Hurlbert's pocket was fabricated.  As

18  discussed above, this version of the events was presented to the jury by Petitioner and

19  ultimately rejected.

20        Presentation of a conflicting version of events does not establish the prosecutor's

21  knowing use of perjured testimony. *Zuno–Arce*, 44 F.3d at 1423; *see also Geston*, 299

22  F.3d at 1135.  In addition, Deputies Fuhr, Robbins and Laplant were subjected to cross-

23  examination by Petitioner at trial, who challenged their testimony in detail. (Lodgment

24  No. 1, vol. 5 at 1134-40, 1221-25, 1276-80.)  It was for the jury to decide whether

25  Deputy Fuhr or Petitioner were credible witnesses and how much of their testimony was

26  to be believed.  *See, e.g., Walters v. Maass*, 45 F.3d at 1358 (it is province of jury to

27  determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

28  inferences from proven facts); *Bruce*, 376 F.3d at 957 (jury's credibility determinations

1  are entitled to near-total deference); *see also Carothers v. Rhey*, 594 F.2d 225, 229 (9th
2  Cir. 1975).

3      Petitioner's allegations regarding these allegedly "false" statements simply do not
4  demonstrate a *Napue* violation because he has not shown that the evidence in question
5  was false or that the prosecutor knew or reasonably should have known it was false. *See*
6  *Mancuso*, 292 F.3d at 957 (rejecting *Napue* claim where there was no evidence
7  prosecutor presented false testimony); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th
8  Cir. 2001) (rejecting claim that prosecution suppressed evidence that witness' testimony
9  was false because, even assuming testimony was false, petitioner presented no evidence
10  that prosecution knew it was false).  Therefore, Petitioner has failed to establish a due
11  process violation based on presentation of false evidence.

12      Next, Hurlbert claims his due process rights were violated when the prosecutor
13  withheld exculpatory evidence.  (Pet. at 38.)  The Supreme Court has held that "[t]he
14  suppression by the prosecution of evidence favorable to an accused upon request violates
15  due process where the evidence is material either to guilt or punishment, irrespective of
16  the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  Although this
17  rule originally covered only exculpatory evidence, the Supreme Court has extended it to
18  include impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

19      In order to establish a *Brady* violation, a defendant must show three things:  (1) the
20  evidence must have been suppressed by the prosecution, either willfully or inadvertently,
21  (2) the withheld evidence must be either exculpatory or impeachment material, and (3)
22  the evidence must be material to the defense. *Benn v. Lambert*, 283 F.3d 1040, 1052-53
23  (9th Cir. 2002) (citing *Bagley*, 473 U.S. at 676, 678.)

24      Here, Petitioner fails to identify what evidence was purportedly suppressed by the
25  prosecution, whether that evidence truly existed, or how that evidence would have
26  benefitted the defense.  Such conclusory allegations are insufficient to warrant habeas
27  relief. *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (concluding petitioner's
28  allegation that prosecution failed to turn over evidence in violation of *Brady* was

1  conclusory and insufficient to warrant habeas corpus relief when allegation was

2  unsupported by the record); *see also James v. Borg*, 24 F.3d 20, 26 (9th Cir.1994)

3  ("Conclusory allegations which are not supported by a statement of specific facts do not

4  warrant habeas relief."). Therefore, Petitioner has failed to establish a due process

5  violation pursuant *Brady*.

6         Finally, Petitioner appears to also argue that his *Miranda* rights were violated when

7  he was questioned after his arrest. To be entitled to *Miranda* warnings, two factors must

8  be established: custody and interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)

9  Even if there was a *Miranda* violation, Hurlbert is not entitled to habeas relief unless he

10  shows the erroneously admitted evidence had a "substantial and injurious effect or

11  influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 642

12  (1993); *see also Ghent v. Woodward*, 279 F.3d 1121, 1126 (9th Cir. 2002).

13         Petitioner claims he was questioned by Deputy Fuhr while he was in handcuffs.

14  He contends Deputy Fuhr asked him "Where is the shirt?" and Hurlbert responded, "It's

15  in the house by the wallet and keys, through the side door." (Pet. at 43.) Deputies

16  Robbins and Fuhr, on the other hand, both testified that Hurlbert made spontaneous,

17  unsolicited statements about his identity, the shirt which was on the ground next to him,

18  and the wallet he was carrying. (Lodgment No. 1, vol. 4 at 1092-96, vol. 5 at 1218-20.)

19  *Miranda* protection does not apply to statements that are spontaneously made and not the

20  product of interrogation. *See Miranda*, 384 U.S. at 478 (statements given "freely and

21  voluntarily" not subject to *Miranda* warnings); *Beaty v. Stewart*, 303 F.3d 975, 991 (9th

22  Cir. 2002) (spontaneous or volunteered statement of suspect in custody admissible in

23  absence of Miranda warnings); *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.

24  1981) (same).

25         Even assuming *Miranda* did apply to the statements Hurlbert claims he made, he

26  would not be entitled to habeas relief because he cannot show prejudice under *Brecht*.

27  Indeed, it was Hurlbert himself who introduced the statements at trial, during his own

28  testimony, to support his claim that he did not take the items from the Tibbets' residence,

1   and that Deputy Fuhr obtained them after his arrest and planted them.  Hurlbert testified

2   in his own defense that he told Fuhr, in response to his question about the shirt, that the

3   blue shirt was in Tibbett's house, near the side door, along with Tibbetts' wallet and keys.

4   (Lodgment No. 1, vol. 6 at 1351-52.)  As discussed above, the jury clearly rejected

5   Hurlbert's version of events.  Given the other evidence presented at trial, Hurlbert has not

6   established any purported error had "'a substantial and injurious effect' on the verdict.'"

7   *See Dillard v. Roe*, 244 F.3d 758, 767 n. 7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at

8   623)

9          In sum, Petitioner's assertion that his due process rights were violated by the

10   presentation of false evidence and the withholding of exculpatory evidence, is without

11   merit.  In addition, Petitioner has not established that his *Miranda* rights were violated or

12   that he was prejudiced as a result.  Based on the foregoing, it is clear that Hurlbert has not

13   raised even a colorable federal claim for relief as to ground two.  *See Cassett*, 406 F.3d at

14   624.  Accordingly, the Court **RECOMMENDS** the claim be **DENIED**.

15          **D.      Ineffective Assistance of Appellate Counsel**

16          Finally, Petitioner argues appellate was ineffective in failing to raise arguable

17   issues on direct appeal, specifically the claims presented in "Ground Two" of the

18   Petition. (*See* Pet. at 47.)  As discussed above, this Court has already determined that

19   Petitioner failed to raise this claim in the California Supreme Court.  (*See* Order Denying

20   Stay, Oct. 8, 2015 (ECF No. 15)).  Nevertheless, the Court will address the merits in the

21   interest of judicial economy.  *See Cassett*, 406 F.3d at 624. (stating a court may deny an

22   unexhausted claim on the merits when "it is perfectly clear that the applicant does not

23   raise even a colorable federal claim"); *see also Lambrix,* 520 U.S. at 524 (1997) (where it

24   is easier to resolve a petitioner's claims on the merits, the interests of judicial economy

25   counsel against deciding the often more complicated procedural issue).

26          It is clearly established that "[t]he proper standard for evaluating [a] claim that

27   appellate counsel was ineffective . . . is that enunciated in *Strickland* [*v. Washington*, 466

28   U.S. 668, 688 (1984)]."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v.*

1    *Murray*, 477 U.S. 527, 535-36 (1986)).  A petitioner must first show that his appellate

2    counsel's performance fell below an objective standard of reasonableness.  *Strickland*,

3    466 U.S. at 688.  Specifically, a petitioner must show that counsel "unreasonably failed to

4    discover nonfrivolous issues and to file a merits brief raising them."  *Smith*, 528 U.S. at

5    285.  He must then show he was prejudiced by counsel's errors.  *Strickland*, 466 U.S. at

6    694.  To establish prejudice, Hurlbert must demonstrate that she would have prevailed on

7    appeal absent counsel's errors.  *Smith*, 528 U.S. at 285.

8      The Ninth Circuit has observed that:

9         [Strickland's] two prongs partially overlap when evaluating the
10      performance of appellate counsel. In many instances, appellate counsel will
         fail to raise an issue because she foresees little or no likelihood of success on
11      that issue; indeed, the weeding out of weaker issues is widely recognized as
         one of the hallmarks of effective appellate advocacy. . . . Appellate counsel
12      will therefore frequently remain above an objective standard of competence
13      (prong one) and have caused her client no prejudice (prong two) for the
         same reason-because she declined to raise a weak issue.
14

15    *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Appealing every arguable issue

16    would do disservice to a client because it would draw an appellate judge's attention away

17    from stronger issues and reduce appellate counsel's credibility before the appellate court.

18    *Id.* at 1428.

19      As discussed above in section V(B) of this Report and Recommendation,

20    Petitioner's claim that the prosecutor presented false testimony or withheld evidence, is

21    without merit – as is his claim that his *Miranda* rights were violated.[4]  Thus, because the

22    issues lacked merit, it was neither deficient performance no prejudicial for appellate

23

24

---

25    [4] Petitioner also failed to raise the *Miranda* claim before the trial court.  As such, the issue was waived
26    under California state law.  *See* Cal. Evid. Code § 353; *see also People v. Polk*,190 Cal.App.4th 1183,
      1194 (2010) ("[U]nless a defendant asserts in the trial court a specific ground for suppression of his or
27    her statements to police under *Miranda*, that ground is forfeited on appeal.")  Appellate counsel is not
      ineffective for failing to raise an issue that was forfeited.  *See Jones v. Smith*, 231 F.3d 1227, 1239 n. 8
28    (9th Cir. 2000) (holding failure to raise issues on direct appeal does not constitute ineffective assistance
      when appeal would not have provided grounds for reversal).

1   counsel to decline to raise them on appeal. *See Miller*, 882 F.2d at 1434. Accordingly,

2   Hurlbert has failed to present a colorable claim for relief and the Court **RECOMMENDS**

3   the claim be **DENIED**. *See Cassett*, 406 F.3d at 624.

4   **VI.    CONCLUSION AND RECOMMENDATION**

5          The Court submits this Report and Recommendation to United States District

6   Judge Anthony J. Battaglia under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the

7   United States District Court for the Southern District of California. For the reasons

8   outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1)

9   approving and adopting this Report and Recommendation, and (2) directing that

10  Judgment be entered **DENYING** the Petition.

11         **IT IS HEREBY ORDERED** that any party to this action may file written

12  objections with the Court and serve a copy on all parties no later than June 20, 2016.

13  The document should be captioned "Objections to Report and Recommendation."

14         **IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with

15  the Court and served on all parties no later than June 30, 2016. The parties are advised

16  that failure to file objections within the specified time may waive the right to

17  raise those objections on appeal of the Court's Order. *See Turner v. Duncan*, 158 F.3d

18  449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

19  DATE: May 20, 2016

21  Peter C. Lewis
22  U.S. Magistrate Judge
    United States District Court